## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **Chapter 7** |
| **AGRIPROCESSORS, INC.,** | ) | |
| | ) | |
| Debtor. | ) | **Bankruptcy No. 08-02751** |
| | ) | |
| | ) | |
| **JOSEPH E. SARACHEK, In his** | ) | |
| **capacity as Chapter 7 Trustee,** | ) | |
| | ) | |
| Plaintiff, | ) | **Adversary No. 10-9234** |
| | ) | |
| v. | ) | |
| | ) | |
| **LUANA SAVINGS BANK** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## RULING ON THE MOTION FOR SUMMARY JUDGMENT BY LUANA SAVINGS BANK

This matter came before the Court on Defendant Luana Savings Bank's

Motion for Summary Judgment.  The Court held a hearing on the matter.  Dan

Childers appeared on behalf of Plaintiff, Joseph E. Sarachek, Chapter 7 Trustee.

Dale Putnam appeared on behalf of Defendant, Luana Savings Bank (the "Bank").

After hearing the arguments of counsel, the Court took the matter under

advisement.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(F).

## STATEMENT OF THE CASE

Trustee seeks to recover $5,134,582.68 in preferential transfers under

§ 547(b).  Trustee argues that the Bank's allowance of very large overdrafts that

the Debtor paid back shortly thereafter were short-term loans.  Trustee argues

repayment by Debtor of the short-term loans created a preference.

The Bank has moved for summary judgment.  The Bank argues the

undisputed facts show that under a proper understanding of banking law and

customary banking practices the transfers were not loan repayments.  The Bank

argues because there was no loan or debt, Trustee cannot show any of the transfers

were on account of an antecedent debt—a requirement for Trustee to avoid

transfers under § 547(b).  To the extent there is an antecedent debt and possibility

of recovery under § 547(b), the Bank claims the undisputed facts also establish its

affirmative defenses—that the transfers were in the ordinary course of business

under § 547(c)(2)(A), were made according to ordinary business terms under

§ 547(c)(2)(B), and/or the Bank provided a contemporaneous exchange for new

value under § 547(c)(1).[1]

The Bank also argues any claim by Trustee to recover a setoff under 11

U.S.C. § 553 is barred by the statute of limitations.  The Bank asserts it was not

---

[1] The Bank also claims a defense under § 547(c)(4) but did not seek summary judgment on those
grounds.

pled by the Trustee within "2 years after the entry of the order for relief." 11 U.S.C. § 546(a)(1)(A).

The Trustee asserts there are genuine issues of material fact which prevent summary judgment for the Bank. In addition, the Trustee asserts his preference arguments are consistent with banking law. Trustee also claims his alternative § 553 claim is not time barred and relates back to his original Complaint.

While the Court agrees with the Bank on key questions of the law, the Court ultimately agrees with the Trustee that there are a number of material factual disputes which prevent summary judgment. The Court also agrees with Trustee that Trustee's § 553 claim relates back and is therefore not time barred. The Court denies summary judgment.

## FACTUAL BACKGROUND, PROCEDURAL BACKGROUND, AND THE PARTIES' ARGUMENTS

### I.   General Background

As the Court has noted numerous times, the general background of the 150-plus adversaries in this bankruptcy case is undisputed and identical. Here, in this adversary, the factual background is particularly intertwined with the procedural background and parties' arguments. The Court describes them together to better illustrate the issues for summary judgment and how they arose.

Debtor owned and operated one of the nation's largest kosher meatpacking and food-processing facilities in Postville, Iowa. On November 4, 2008, Debtor

3

filed a Chapter 11 petition in the Bankruptcy Court for the Eastern District of New York.  Debtor's bankruptcy petition and accompanying documents recited that its financial difficulties resulted from a raid conducted by U.S. Immigration and Customs Enforcement.  A total of 389 workers at the Postville facility were arrested.  The raid led to numerous federal criminal charges, including a high-profile case against Debtor's President, Sholom Rubashkin.[2]  Debtor's Petition also stated it had over 200 creditors and assets and liabilities in excess of $50,000,000.00.

The Bankruptcy Court for the Eastern District of New York eventually approved the appointment of Joseph E. Sarachek as the Chapter 11 trustee.  The Court concluded that appointing a trustee was necessary in part "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management" under § 1104(a)(1).  After hearings in a later proceeding, the Court transferred the case to this Court on December 15, 2008.  This Court eventually granted the Trustee's motion to convert the case to a Chapter 7 bankruptcy.  The U.S. Trustee for this region retained Mr. Sarachek as the Chapter 7 Trustee.

---

[2] Rubashkin was convicted on 85 counts of financial fraud.

## II.   Specific Factual Background for This Case

In this particular adversary case, there is little dispute about many of the important facts.  The Bank is located in Luana, Iowa, a small town near Postville, Iowa where Debtor conducted its operations.  Debtor banked with the Bank for at least a year before bankruptcy.  Debtor maintained at least two separate checking accounts with the Bank.  The Debtor used checking account no. 1430 ("account 1430") for daily transactions.  Account 1430 is the primary account at issue in this case.  The second account, checking account no. 367788 ("account 367788"), was not used for daily transactions.  However, at the times relevant to this case Debtor had between $1,150,000.00 and $1,400,000.00 on deposit in account 367788.

There appears to be a dispute about whether Debtor had access to the funds in account 367788.  The Bank alleges that the balance in that account was inaccessible to the Debtor.   The Bank claims it placed a hold on the account.  The Bank claims account 367788 provided the Bank security if Debtor wrote checks that exceeded the amount on deposit in Debtor's primary account—1430.  Thus, the funds deposited in account 367788 may have enabled Debtor's check writing privileges on account 1430.  Less than a month before Debtor filed bankruptcy, the Bank transferred $1,400,000.00 from account 367788 to cover overdrafts in account 1430.

In the ninety days before bankruptcy, Debtor wrote hundreds of checks totaling multi-millions of dollars on account 1430.  The vast majority of checks were processed through the standard check clearing process.  When a check is not presented to the same bank on which it is drawn, the check is settled through a clearinghouse.  After a check is presented by a payee to the payee's bank, the check is first "provisionally settled" through the check clearing process.  On one side of the settlement, the clearinghouse credits the account of the payee bank at the clearinghouse.  The payee bank then in turn credits the funds to the payee's individual account.  On the other side of the transaction, the clearinghouse debits the account of the payor bank at the clearinghouse.  When the payor bank receives notice of individual items processed by the clearinghouse, the payor bank then in turn debits a customer's individual checking account on which the check is drawn. This process is now highly automated.

There is no dispute that during the ninety days before bankruptcy the Bank allowed the Debtor to write hundreds of checks for which it had insufficient funds. The Bank had adopted a "pay all" policy for check clearing.  When the Debtor's checks were presented by the payee's bank through the automated clearing process, the Bank's pay all policy resulted in a "provisional settlement" by the Debtor's Bank (Luana Savings Bank) on all those checks.  The morning of the next banking day, the Bank would receive the details of what individual accounts were

6

provisionally settled through the clearinghouse, under the pay all plan.  Only after

reviewing that report would the Bank learn which accounts had insufficient funds

or were left with a negative balance from the provisional settlements.  This

negative balance is known as an "NSF" position (insufficient funds) or an intraday

overdraft.[3]

Each morning, Bank president and majority owner, David Schultz, would

carefully review the report of which accounts were overdrawn or had a negative

balance.  He believed—and still believes—the decision to honor checks falls on a

two-day cycle.  He believed he had until the customary "midnight deadline"—

midnight on the day after a provisional settlement—to decide what to do.  He

described several options he believed he had on that second day.  He could have

the Bank immediately dishonor and return the check for insufficient funds—i.e.,

bounce the check.  He could decide to have the Bank immediately honor the check

and create an overdraft in the account.  He could also wait on the customer to

provide funds by cash, check, or wire transfer to cover the intraday overdraft

before the "midnight deadline."

The process the Bank chose most of the time was the last one.  A secretary at

the Bank would call Debtor to make sure a covering payment was coming.  If

---

[3] For clarity, the Court will use the term intraday overdraft to describe an overdraft on the second
banking day following presentment.  The Bank claims that a "true overdraft" creating a debt does
not occur until the "midnight deadline" has passed and the provisional settlement has become
final.

Debtor said money would come in to cover the checks, the Bank would wait for the funds before making a decision on honoring the check.  Most days Debtor would make a wire transfer before the "midnight deadline" that satisfied the Bank, and thus the Bank honored most of the checks on Debtor's checking account. However, there also appear to be days when a wire did not come in to "cover."  On one of those occasions the Bank transfered the $1,400,000.00 in account 367788 to cover the negative balance.  Other times, the Bank honored the checks without receiving covering funds or decided to dishonor and return them.

### III.  Trustee's Complaint and Theories of Recovery

On November 3, 2010, Trustee filed this adversary action against the Bank seeking to set aside preferential transfers under 11 U.S.C. § 547(b).  The Trustee alleges that the Debtor and the Bank had a special relationship in which the Bank allowed the Debtor special overdraft privileges which it did not extend to its other customers.  The Trustee claims that in allowing the regular overdrafts, the Bank was in fact giving the Debtor a series of short-term loans.  The Trustee claims that each time a check was presented for provisional settlement and the settlement resulted in a negative funds balance—an intraday overdraft—the Bank was in fact extending credit.  Therefore, this series of repeated overdrafts was a series of short-term loans.

8

The Trustee argues that each time Debtor made a deposit, wire transfer, and/or transfer from other accounts to cover the overdrafts, the Debtor was in fact making a payment on a short-term loan during the preference period. The repayment of these short-term loans was the repayment of an antecedent debt and therefore a preferential transfer to the individual creditor.

The Trustee even argues that the reversing of the provisional settlement when a check is dishonored the next day (or the customer orders the bank to stop payment) results in a preferential transfer. The Trustee argues that the Bank had extended short-term credit in the provisional settlement, and each time a check was later dishonored by the Bank, the Bank received a refund (preferential transfer) of the provisional settlement. These refunds improved the Bank's position as a creditor, because it functioned to repay the short-term (intraday) loan. The Trustee argues that without those refunds, the intraday overdrafts would have been unpaid claims that led to larger claims by the Bank in Debtor's bankruptcy. In total, the Trustee seeks to avoid "at least" $5,134,582.68, the largest one-day negative balance in account 1430 during the ninety day preference period—i.e., the greatest single extension of credit during the period.

The Trustee argues that Debtor was engaged in a massive check-kiting scheme and that the Bank enabled the Debtor's fraud. The Trustee alleges that Debtor purposefully created a "float" by writing bad checks—checks for which it

knew it had insufficient funds on deposit—in order to obtain a free day of credit.

Despite the allegations of fraud and check-kiting, the Trustee only seeks recovery

from the Bank under § 547(b).  The Trustee points out that the check-kiting

scheme provides context and also shows how the Bank—probably unwittingly—

helped the scheme by being very liberal with Debtor's overdrafts.

On June 29, 2011, Trustee filed his Second Amended Complaint and added

a claim to recover a setoff under § 553.  The Trustee claimed that "some or all of

the transfers" may be avoidable not simply as preferential transfers under § 547(b)

but may also "constitute improper setoffs pursuant to 11 U.S.C. § 553."  (Second

Amended Compl., ECF Doc. No. 26, at 4.)  This claim appears to be directed

primarily at the Bank's transfer of the $1,400,000.00 from account 367788 shortly

before bankruptcy.

## IV.  The Bank's Answer and Defenses

On October 27, 2011, the Bank answered Trustee's Second Amended

Complaint.  The Bank claims that the transfers were not on account of an

antecedent debt.  The Bank argues that provisional overdrafts were covered by the

next day's deposits in almost every case and were therefore never "true

overdrafts."  The Bank had not made a final decision to honor the checks before

Debtor's money transfers came in to cover the provisional negative balances.   The

Bank argues only a "true overdraft" can create an antecedent debt and true

10

overdrafts occur only where the funds do not come in before the midnight deadline. Without the antecedent debt, the Bank argues that none of the transactions are avoidable as preferential transfers.

To the extent there is an antecedent debt, the Bank asserts the affirmative defenses under § 547(c)(1), (c)(2), and (c)(4) bar Trustee's claims. In particular, the Bank argues all transfers were in the ordinary course of business under § 547(c)(2)(A), were made according to ordinary business terms under § 547(c)(2)(B), and that the transfers were a contemporaneous exchange for new value under § 547(c)(1). The Bank also claims that because it subsequently provided new value, the total amount of transfers avoidable as preferential transfers must—at a minimum—be reduced by the amount of this new value under § 547(c)(4).

## V.   The Bank's Motion for Summary Judgment

On July 12, 2012, after extensive discovery, the Bank filed a Motion for Summary Judgment. In the motion, the Bank argues essentially that any "float" period created between "provisional settlement" and the Bank's final decision is not an extension of credit but rather is simply attributable to the normal check clearing process. The Bank argues that under a proper understanding of normal banking practices and the Uniform Commercial Code ("U.C.C."), which governs

the banking relationship, the temporary negative balances did not constitute actual

debts incurred by the Bank.

### A.   Expert Testimony and the Two-Day Banking Cycle

In support of the motion, the Bank's personnel and its experts describe the

U.C.C.-based clearinghouse process and how it should be applied here.  All of the

Bank's witnesses describe a two-day banking transaction process.  On day one of

the transaction, the clearinghouse process results in a "provisional settlement,"

which creates a negative entry in Debtor's account.  The provisional settlement is

"finally settled" through the clearinghouse system on day two.  The Bank and its

experts assert that several things could happen before the midnight deadline on day

two that can prevent a "true overdraft" (most of which was described above in the

Bank President's testimony).

To restate, they believe: (1) the customer could deposit or wire funds to

cover the provisional overdraft (the primary method used here); (2) the customer

could stop payment on the check; (3) the bank could dishonor the check—i.e.,

"bounce" the check; or (4) the bank could allow the check to clear—creating a

"true overdraft" and extending credit to its customer.

The Bank personnel and their experts assert that the bank avoided "true

overdrafts" in this case through the use of methods (1) and (3).  Debtor either made

a wire transfer to the Bank to cover the "provisional" overdrafts from the day

12

before or else the Bank dishonored the checks.  The Bank argues Debtor cured

these intraday overdrafts before the midnight deadline in the vast majority of cases.

A critical part of the Bank's analysis requires the Court to consider the

"security" money deposited in account 367788 as part of the calculation that kept

account 1430 from falling into a "true overdraft" status.  Thus, the Bank asks the

Court to determine "true overdraft" status by looking at the account as of midnight

on the second day and to consider: (1) the amount of the wire transfers before

midnight on the second day; plus (2) the amount on deposit in account 367788;

minus (3) the amount of any checks bounced or stopped.  In other words, the Bank

asks the Court to consider the amount in account 367788 ($1,400,000.00 for most

of the preference period) to be an amount added to the sum in account 1430 at the

end of each banking day.  Under this method the Bank argues the Court can only

find a "true overdraft" (which is an extension of credit) where the net position of

account 1430 after the second day is negative, considering the funds in all accounts

held by the Bank.

To illustrate its argument about how the calculation should work, the Bank

uses the largest negative account balance, which is the amount in Trustee's

complaint, and the next day's activity.  The Bank admits the negative balance

shown on the September 2, 2008 statement was $5,134,582.68.  It notes, however,

that the next day a wire transfer for $1,695,000.00 came in to reduce the negative

13

balance.  That day, the Bank also returned ("bounced") $2,000,753.38 of checks

for insufficient funds.  The Bank also held security of $1,400,000.00 by virtue of

the money on deposit in account 367788.  When all of these amounts are added

back to the $5,134,582.63 negative value on September 2, 2008, the Bank argues

only $38,828.70 in "true overdrafts" remain.[4]  The Bank argues Trustee cannot

recover even that reduced amount because of the Bank's affirmative defenses

under § 547(c).  The Bank argues the transactions occurred within the ordinary

course of business or according to ordinary business terms.  At a minimum, the

Bank argues any extension of credit was in fact part of a contemporaneous

exchange for new value.

One of the Bank's experts, Jolene Topinka, like the Bank's other witnesses,

provided a report and deposition testimony supporting the above analysis.

However, Ms. Topinka provided both testimony and documentation showing "true

overdraft" amounts on numerous days within the ninety day period before

bankruptcy.  These "true overdrafts" were days that showed a negative balance

even after second-day wire transfers, bounced checks, and the $1,400,000.00 in the

second account were considered.  These amounts ranged from negative $8,212.36

to $842,594.53.  Neither Ms. Topinka nor the other Bank witnesses specifically

---

[4] The Court notes the records for September also show a number of NSF check fees.  These do
not appear to be loans and would likely need to be subtracted in the final analysis.

addressed whether all those "true overdrafts" were covered by the Bank's defenses under § 547(c).

## B.    The Bank's Reliance on Supreme Court Case Law

In addition to the experts and U.C.C. analysis, the Bank relies on a number of cases—and in particular the Supreme Court's decision in <u>Barnhill v. Johnson</u>, 503 U.S. 593 (1992). The Bank argues that in <u>Barnhill</u> the Supreme Court definitively determined the time a transfer occurs for purposes of a § 547(b) preferential transfer claim. The Bank argues that under <u>Barnhill</u>, at least for purposes of a § 547(b) claim, the transfer to the payee of the check does not occur until the check is finally honored (i.e., the time of final settlement). The Bank argues that this implies, at least for purposes of § 547(b), there is not a loan or extension of credit until the time such funds are actually transferred to the payee of the check. Under <u>Barnhill</u> that transfer occurs at the time of final settlement.

Thus, the Bank argues that, under <u>Barnhill</u> and the U.C.C., the Bank has until the "midnight deadline"—midnight on the day after a provisional settlement—to make a final decision on whether to honor a check. Until the midnight deadline passes, any provisional settlement is reversible and is not a loan or extension of credit. The Bank believes that as a matter of course the Debtor either made the necessary transfers to cover the provisional overdraft by the midnight deadline or else the Bank refused to honor the checks. Consequently, the

15

Bank claims there was no legally cognizable short-term loan and thus no antecedent debt in the vast majority of transactions during the ninety day preference period.  Therefore, the Trustee can recover little if anything under § 547(b), and the Bank is entitled to summary judgment.

### C.    The Bank's Affirmative Defenses Under § 547(c)

The Bank also argues that even if the "provisional settlement" actually did result in a short extension of credit which created a debt for bankruptcy purposes, the Trustee is still not entitled to avoid the transfers because of the Bank's affirmative defenses under § 547(c).  The Bank asks for summary judgment under § 547(c)(2) and argues any payments that were received were in the ordinary course of business between the Bank and the Debtor and/or were made according to ordinary business terms.  The Bank also asks for summary judgment under § 547(c)(1) and argues that any payments represented a contemporaneous exchange for new value and were so intended.  The Bank relies on the same expert testimony and factual assertions to show there are no genuine issues of material fact on its affirmative defenses.

### D.    The Banks Defenses to Trustee's Setoff Claims for the Transfer from Account 367788

The Bank admits that on October 24, 2008, it transferred the $1,400,000.00 in account 367788 it had been claiming as "security" to cover intraday overdrafts in account 1430 because no wire transfers were coming.  The Bank argues the

Trustee's claim for setoff is time barred because Trustee did not bring it within "2

years after the entry of the order for relief." 11 U.S.C. § 546(a)(1)(A). The Bank

also argues, as with the § 547(b) claims, that Trustee's § 553 claim is ineffective

because no debt arose during the intraday period to "setoff" against. Thus, it

argues there was no mutual indebtedness to be offset.

### VI.  Trustee's Resistance to the Bank's Motion for Summary Judgment

On August 2, 2012, Trustee responded to the Bank's Motion for Summary

Judgment arguing there are many genuine issues of material fact. Trustee argues

that the facts show that the provisional settlements that resulted in intraday

overdrafts were extensions of credit that functioned as short-term loans. The

Trustee points out the Bank had a unique and special relationship with the Debtor

that led to the huge overdraft allowances here. The Trustee asserts that the wire

and other transfers from Debtor were the repayments of the short-term loans.

Those repayments created preferential transfers.

Trustee argues that there are genuine issues about whether these provisional

settlements and repayments were made in the ordinary course of business or

according to ordinary business terms. The Trustee notes, for example, that during

the preference period Debtor's overdrafts increased substantially. On this basis,

Trustee argues that as the Debtor approached bankruptcy, the parties abandoned all

semblance of an ordinary course of business and/or the transactions were not made

17

according to ordinary business terms.  Trustee also argues that the payments

Debtor made were not intended to be contemporaneous exchanges for new value.

Trustee argues essentially that because the repayment period was not fixed, there is

no indication that the parties intended the repayment to be "contemporaneous."

### A.  Trustee's Expert Witnesses

Trustee, like the Bank, retained experts to discuss when an overdraft arises

and to describe the ordinary course of business in banking transactions.  Trustee's

experts offered opinions tending to agree with the Bank's experts about the two-

day banking cycle for determining overdrafts.  Trustee's experts noted the parties'

banking relationship was unusual and raised many questions.  They noted it was

not good banking practice to allow so many and such large intraday overdrafts—

even if they are cured by incoming transfers the next day.  Trustee's experts noted

that the Bank was careless in letting this practice continue for such a long period of

time.  Both of Trustee's experts concluded this banking relationship was not an

ordinary banking relationship or part of the ordinary course of banking business.

### B.  Trustee's Setoff Argument

Trustee also argues the § 553 claim from his Second Amended Complaint

relates back to the original Complaint and therefore is not barred by the statute of

limitations.  First, as with the § 547(b) claims, Trustee claims that the overdrafts

created an antecedent debt which was offset against the amount the Bank owed

18

Debtor—the balance in account 367788.  Second, Trustee claims his original

Complaint described the same operative facts and that Exhibit A to that complaint

referenced the $1,400,000.00 transfer (the proposed setoff claim).

> The $1,400,000 transfer from Account No. 367788 to Account No.
> 1430 is plainly included in Exhibit A, Monthly Statements for
> Account No. 1430 for the Period 8/4/08 through 11/4/08.  Document
> 1-7 Part 6 at P. 1.  Not only does the improper set-off cause of action
> in the Trustee's Amended Complaint relate to the general fact
> situation alleged in the original pleading, but it actually arises from a
> specific transaction documented in the bank statement attached to
> the original pleading.

(Resistance to the Mot. for Summ. J., ECF Doc. No. 101-1, at 29.)  Trustee also

argues that if there is a "security" relationship between account 367788 and

account 1430—as the Bank argues—then it should have been clear to the Bank that

account 367788 was also placed in issue in the original Complaint due to its close

relationship to account 1430.  Trustee claims "[i]t borders on absurdity to . . . argue

the set-off of [account 367788] does not relate back to the overdrafting of [account

1430]."  Id. at 30.

On August 24, 2012, the Bank filed a reply brief.  The Bank addressed the

Trustee's arguments and largely reiterated its earlier arguments.  The Court held a

hearing on the matter on September 24, 2012, and took the matter under

advisement without further briefs.

## CONCLUSIONS OF LAW AND DISCUSSION

### I.   Summary Judgment

Summary judgment is governed by Rule 7056 of the Federal Rules of

Bankruptcy Procedure.  Bankruptcy Rule 7056 applies Federal Rule of Civil

Procedure 56 in adversary proceedings.  Federal Rule 56 states, in relevant part,

that: "The court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  The granting of "[s]ummary judgment is

proper if, after viewing the evidence and drawing all reasonable inferences in the

light most favorable to the nonmovant, no genuine issues of material fact exist and

the movant is entitled to judgment as a matter of law."  Hayek v. City of St. Paul,

488 F.3d 1049, 1054 (8th Cir. 2007).

The burden of showing there are no genuine issues of material fact belongs

to the moving party.  Winthrop Res. Corp. v. Eaton Hydraulics, Inc., 361 F.3d 465,

468 (8th Cir. 2004).  "Once the movant has supported the motion, the non-moving

party 'must affirmatively show that a material issue of fact remains in dispute and

may not simply rest on the hope of discrediting the movant's evidence at trial.'"  In

re Houston, 385 B.R. 268, 271 (Bankr. N.D. Iowa 2008) (quoting Barge v.

Anheuser-Busch, Inc., 87 F.3d 256, 260 (8th Cir. 1996)).  "When a moving party

has carried its burden under Rule 56(c), the party opposing summary judgment is

required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the

depositions, answers to interrogatories, and admissions on file, <u>designate specific

facts</u> showing there is a genuine issue for trial." <u>G.E. Capital Corp. v. Commercial

Servs. Grp., Inc.</u>, 485 F. Supp. 2d 1015, 1022 (N.D. Iowa 2007) (emphasis added)

(quotations omitted).

"A 'material' fact is one 'that might affect the outcome of the suit under the

governing law . . . .'" <u>Johnson v. Crooks</u>, 326 F.3d 995, 1005 (8th Cir. 2003)

(quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).  An issue of

material fact is genuine if a reasonable fact-finder could return a verdict for the

nonmoving party on the question.  <u>Anderson</u>, 477 U.S. at 252.  Evidence that raises

only "some metaphysical doubt as to the material facts" does not create a genuine

issue of fact.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio, Corp.</u>, 475 U.S. 573,

586 (1986).  "'Where the record taken as a whole could not lead a rational trier of

fact to find for the nonmoving party, there is no genuine issue for trial.'" <u>In re

Patch</u>, 526 F.3d 1176, 1180 (8th Cir. 2008) (quoting <u>Matsushita</u>, 475 U.S. at 587).

## II.  Preferential Transfers

Under 11 U.S.C. § 547(b), Trustee is allowed to avoid preferential transfers

to non-insider creditors made within ninety days of bankruptcy.

Title 11 U.S.C. § 547(b) requires that in order for a transfer to be
subject to avoidance as a preference, (1) there must be a transfer of an
interest of the debtor in property, (2) **on account of an antecedent
debt**, (3) to or for the benefit of a creditor, (4) made while the debtor

was insolvent, (5) within 90 days prior to the commencement of the bankruptcy case, (6) that left the creditor better off than it would have been if the transfer had not been made and the creditor asserted its claim in a Chapter 7 liquidation.

Wells Fargo Home Mortg., Inc. v. Lindquist, 592 F.3d 838, 842 (8th Cir. 2010) (emphasis added) (citation omitted); 11 U.S.C. § 547(b).  "The trustee has the burden to establish these elements by a preponderance of the evidence."  Sarachek v. Chitrik (In re Agriprocessors, Inc.), Bankr. No. 08-02751, Adv. No. 10-09058, 2011 WL 3033710, at *2 (Bankr. N.D. Iowa Jul. 22, 2011) (citing Lindquist, 592 F.3d at 842).

### III.  Check Settlement Under the Uniform Commercial Code

In this case, all possibly avoidable transfers are banking transactions related to the Debtor's use of its checking account at the Bank.  The Bank claims that under Iowa law provisional settlements it extended to the Debtor as part of the clearinghouse process did not constitute short-term loans or extensions of credit or create a real debt.  Iowa has adopted the U.C.C. to govern bank deposits and collections.  See generally Iowa Code § 554; see also Farm Credit Servs. of Am. v. Am. State Bank, 212 F. Supp. 2d 1034, 1040–41 (N.D. Iowa 2002) (finding "the state law requirements under the UCC are additional requirements to those imposed by [federal regulations]" and not superseded), aff'd, 339 F.3d 764 (8th Cir. 2003).  Under the U.C.C., a check is honored when it is paid and "is dishonored if the bank makes timely return or sends timely notice of

dishonor . . . ."  Iowa Code § 544.3502; U.C.C. § 3-502.  The initial settlement

made during the initial part of the clearing process (which the Bank calls day one)

is intended to be "provisional."  Iowa Code §§ 554.4215, 554.4301; U.C.C. §§ 4-

215, 4-301.

Iowa Code section 544.4215 is entitled "Final Payment of Item by Payor

Bank—when Provisional Debits and Credits Become Final—when Certain Credits

Become Available for Withdrawal."  That section defines when payment of an

item is considered final.  In the case of clearinghouse transactions, the provisional

settlement will be final "**upon final payment** of the item by the payor bank."

Iowa Code § 544.4215(3) (emphasis added).

1. An **item is finally paid** by a payor bank **when** the bank has first
   done any of the following:

   a.  paid the item in cash;

   b.  settled for the item without having a right to revoke the
       settlement under statute, clearing-house rule, or agreement; or

   c.  **made a provisional settlement** for the item and **failed to
       revoke** the settlement **in the time and manner permitted** by
       statute, clearing-house rule, or agreement.

Iowa Code § 544.4215(1) (emphasis added).  As the Bank has argued, the time to

revoke expires at the midnight deadline of day two.  Provided the check was not

presented "for immediate payment over the counter . . . , the payor bank may

revoke the settlement and recover the payment settlement if, before it has made

final payment and before its **midnight deadline**, it . . . returns the item." Iowa

Code § 554.4301(1)(a) (emphasis added).

The midnight deadline is at "**midnight on its next banking day** following

the banking day on which it receives the relevant item or notice or from which the

time for taking action commences to run, whichever is later." Iowa Code

§ 554.4104(1)(j) (emphasis added).

> "Banking day" means the part of a day on which a bank is open to the
> public for carrying on substantially all of its banking functions but
> for the purposes of determining a bank's midnight deadline, shall not
> include Saturday, Sunday, or any holiday when the federal reserve
> banks are not performing check clearing functions.

Iowa Code § 554.4104(1)(c). Iowa added language not found in the standard

U.C.C. provision, starting with "but for the purposes of determining a bank's

midnight deadline, shall not include . . . ." Iowa Code § 554.4104(1)(c); U.C.C.

§ 4-104(a)(3); UCC Local Variations § 4-104 (West 2012) (noting the change in

the Iowa definition).

Much of this is confirmed by Part 4 of Article 4 of the U.C.C., which

describes the "Relationship Between Payor Bank and Its Customer." Iowa Code

section 544.4402 provides:

> 1. Except as otherwise provided in this Article, a payor bank
> wrongfully dishonors an item if it dishonors an item that is properly
> payable, but **a bank may dishonor an item that would create an
> overdraft unless it has agreed to pay the overdraft**.
> . . .

24

> 3. **A payor bank's determination of the customer's account balance on which a decision to dishonor for insufficiency of available funds is based may be made at any time between the time the item is received by the payor bank and the time that the payor bank returns the item or gives notice in lieu of return**, and no more than one determination need be made. If, at the election of the payor bank, a subsequent balance determination is made for the purposes of reevaluating the bank's decision to dishonor the item, the account balance at the time is determinative of whether a dishonor for insufficiency of available funds is wrongful.

Iowa Code § 554.4402(1), (3) (emphasis added); U.C.C. § 4-402(a), (c). The official comment clarifies that the decision to honor is only made after the bank determines whether there are sufficient funds by "post[ing]" the presented items.

Iowa Code § 554.4402, cmt. 4; U.C.C. § 4-402, cmt. 4.

> 4. Banks commonly determine whether there are sufficient funds in an account to pay an item after the close of banking hours on the day of presentment when they post debit and credit items to the account. The determination is made on the basis of credits available for withdrawal as of right or made available for withdrawal by the bank as an accommodation to its customer. **When it is determined that payment of the item would overdraw the account, the item may be returned at any time before the bank's midnight deadline the following day.** Before the item is returned new credits that are withdrawable as of right may have been added to the account. Subsection (c) eliminates uncertainty under Article 4 as to whether the failure to make a second determination before the item is returned on the day following presentment is a wrongful dishonor if new credits were added to the account on that day that would have covered the amount of the check.

Iowa Code § 554.4402, cmt. 4 (emphasis added); U.C.C. § 4-402, cmt. 4.

Thus, in a clearinghouse transaction in which there was a provisional settlement, an item is honored by the bank when it is "finally paid" by the bank. During the provisional settlement, the bank "determines" whether there are sufficient funds in the account "post[ing] debit and credit items to the account." Iowa Code § 554.4402 (3), cmt. 4; U.C.C. § 4-402(a), cmt. 4.  Only after the initial posting and the determination of account status, the bank makes the decision whether to honor or dishonor.  Id.  An item is "finally paid" by the bank when the bank no longer has the right to revoke the settlement.  U.C.C. §§ 3-502, 4-215(1), (3), 4-301; Iowa Code §§ 544.3502, 544.4215(1), (3), 544.4301.  Conversely, an item is dishonored and not finally paid when the bank returns the item before its midnight deadline.  U.C.C. §§ 3-502, 4-215(2), 4-301; Iowa Code §§ 544.3502, 544.4215(2), 544.4301.

### IV.  Does an Intraday Ledger Balance Overdraft Create a Debt for Bankruptcy Purposes?

One of the central disputes in this case is whether an intraday overdraft—where an account is negative for part of or all of a banking day—constitutes a loan or an extension of credit.  Whether such an extension of credit occurred determines whether there was an antecedent debt, which is a prerequisite to recovering a preferential transfer.  11 U.S.C. § 547(b).  The Trustee claims intraday overdrafts are an extension of credit:

> [I]ntraday overdrafts to cover ledger balance shortfalls such as those experienced by the Debtor are properly characterized as extensions of credit regardless of their duration. As such, these intraday overdrafts constitute claims under the Bankruptcy Code. Facts and testimony strongly suggest, and the Trustee will prove at trial, the transfers made by Debtor to satisfy these obligations the next business day were transfers on account of antecedent debt . . . .

(Resistance to Mot. for Summ. J., ECF Doc. No. 101-1, at 12.) The Bank disagrees and argues that intraday transfers cannot be antecedent debt because the Bank has until the midnight deadline on the banking day following presentment of the check to choose whether to finally pay the check. The Bank claims that only when a check is finally paid is there an extension of credit. The Bank argues any "provisional" payments that resulted in negative day-one ledger balances are not "finally paid" under Iowa law on day one and thus were not sufficient to create antecedent debt to the Bank.

### A. The Eighth Circuit Has Specifically Addressed What May Constitute an Antecedent Debt in a Related Context.

While the Eighth Circuit has never faced this precise issue, it faced a related issue in Laws v. United Missouri Bank of Kansas City, N.A., 98 F.3d 1047 (8th Cir. 1996). In Laws, the Eighth Circuit had to decide whether routine advances by a Bank against it customer's deposited but uncollected funds—referred to as a collected funds overdraft—created an antecedent debt for preference avoidance purposes. In other words, the Eighth Circuit had to determine if the customary

27

practice of a bank to give a depositor immediate credit for a check deposited,

before the Bank actually collected the funds from the check payor's bank, created a

short-term loan.  Laws found that allowing routine advances against uncollected

funds did not create a debtor-creditor relationship.  Id. at 1050–51.  Laws

specifically stated:

> The bank routinely makes uncollected funds available to the depositor, not as a loan, but in recognition of the bank's anticipated debt to the depositor.  Because the vast majority of deposits are collected, banks do not see the decision to make advances on uncollected deposits as a credit decision.  It is a service decision, driven by laws such as the Expedited Funds Availability Act, and by the financial demands of bank customers.  True, a debt will arise if deposited checks are dishonored.  But **until dishonor, a bank that advances funds in the expectation that deposits will routinely be collected acts as a conduit for the depositor's financial transactions, not as a creditor**.  See In re Chase & Sanborn Corp., 848 F.2d 1196, 1201 (11th Cir.1988).

> The test for when a debt is incurred is whether the debtor is legally obligated to pay.  Because the bank collection process is rapid, there are no prior cases determining whether a bank has a legal right to recover advances on uncollected deposits before those deposits are dishonored.  But it is worth noting that banks do not behave as though they have a right to repayment before dishonor.  In this case, for example, when UMB concluded in June 1986 that Kroh's negative collected funds balance was too high, it did not demand repayment.  Instead, UMB threatened to stop advancing credit on future uncollected deposits unless Kroh agreed to pay interest on the resulting negative balances, and UMB did not charge such interest until Kroh agreed to that change in their relationship.

> We further note that federal bank regulators do not consider routine advances on uncollected deposits to be "debts" to a bank.  The Office of the Comptroller of Currency in calculating whether a bank has exceeded its lending limit defines "extensions of credit" to

exclude "amounts paid against uncollected funds in the normal process of collection." 12 C.F.R. §§ 32.2(j)(2)(v). Apparently, the Federal Reserve Board has long taken a similar view. See Clark and Clark ¶ 9.08, at S9-6 & n.48 (1996 Cum. Supp. No. 2).

**Although the issue is not free from doubt, we conclude that routine advances against uncollected deposits do not create a "debt" to the bank. A contrary rule would be inconsistent with the parties' expectations and their view of the banking relationship. A contrary rule would pin banks between the strong federal policy in favor of expedited funds availability and a Bankruptcy Code that treats advances as loans and their reduction as preferences. Such a rule might cause banks to terminate a service that is invaluable in today's economy. See In re Frigitemp, 34 B.R. at 1020. At a minimum, it would immensely complicate many bankruptcy proceedings.**

Laws, 98 F.3d at 1051 (emphasis added).

While Laws provides a strong endorsement of the two-day banking cycle argument the Bank makes here, it did note two scenarios important to this case in which an antecedent debt could be created for preference purposes. See Laws, 98 F.3d at 1050–52 (citing Barnhill while discussing the U.C.C. and the relationship of banks and their customers). The first situation is an actual ledger balance overdraft. See id. at 1050–51 (finding a preference would not arise for an advance against uncollected funds but implying an actual "ledger overdraft" would lead to "preference exposure"). Laws, however, specifically linked a ledger overdraft, to "dishonor," which in this case is in line with the Bank's argument. Id. at 1050 (linking "preference exposure to dishonor (ledger overdraft) situations").

29

The second situation that could give rise to a preference is a non-routine collected funds overdraft. See id. at 1051–52. This would generally be an advance creating an overdraft where the parties have a special debtor-creditor agreement that might define rights differently. Id. "Had [the parties] explicitly agreed to convert future negative collected funds balances into loans, [the customer] would have been legally bound to pay such debts as incurred." Id. at 1052. Laws found some indication of a special agreement in Laws because "[the bank] threatened to stop advancing credit on future uncollected deposits unless [the customer] agreed to pay interest on the resulting negative balances, and [the bank] did not charge such interest until [the customer] agreed to that change in their relationship." Id. at 1051. Laws found the parties "banking relationship" had "many indicia of a loan." Id. at 1051–52. The court then concluded that on the record presented, there was a factual dispute about whether the parties had modified their relationship through a special loan agreement. Id. The court thus found that summary judgment was inappropriate. Id.

Applying the same rationale here, if a special agreement can transform a collected funds advance—normally not considered a loan—into a loan, then the same would be true of an intraday overdraft. In other words, even if an intraday overdraft is generally not an extension of credit until after the midnight deadline, that general rule could be modified by a special agreement of the parties.

30

**B.    The Office of the Comptroller of the Currency
Excludes Intra-day Overdrafts from the Definition of
Loans and Extensions of Credit.**

In deciding whether collected funds overdrafts were extensions of credit,

<u>Laws</u> looked to the definition of extensions of credit provided by the Office of the

Comptroller of the Currency.  <u>Laws</u>, 98 F.3d at 1051.  Specific lending limits for

National Banks are found in 12 U.S.C. § 84.  In particular, § 84 authorizes the

Comptroller of the Currency to "prescribe rules and regulations . . . including rules

or regulations to define or further define terms used in this section . . . ."  12 U.S.C.

§ 84(d)(1).  <u>Laws</u> noted and appeared to find persuasive that the Comptroller of the

Currency had excluded "'amounts paid against uncollected funds in the normal

process of collection.'"  <u>Laws</u>, 98 F.3d at 1051 (quoting 12 C.F.R. § 32.2(q)(2)(v)).

This Court takes notice of the fact that the definition of "Loans and extensions of

credit" also excludes "intra-day overdraft[s]."  12 C.F.R. § 32.2(q)(1)(iv).

> (1) **Loans or extensions of credit** for purposes of 12 U.S.C. 84 or 12
> U.S.C. 1464(u), as applicable, and this part include—
> …
> (iv) An overdraft, whether or not prearranged, **but not an intra-day
> overdraft for which payment is received before the close of
> business of the national bank or savings association that makes
> the funds available**;

12 C.F.R. § 32.2(q)(1)(iv) (emphasis added).

## C.   A Debt Is Incurred When a Debtor Is Legally Obligated To Pay.

The Bank argues that in spite of a special relationship between the parties, it is not possible for a "debt" to be created in an intraday overdraft as a matter of law. While the <u>Laws</u> decision noted that a ledger balance overdraft might create an antecedent debt for preference purposes, the court did not analyze <u>when</u> such a debt is legally "incurred."  <u>See</u> <u>Laws</u>, 98 F.3d at 1050.  In this case, the Bank insists it has presented a timing question.  That question is whether a so-called "intraday overdraft," which is cured before the end of the second banking day, constitutes a debt for preference purposes.

In other cases, the Eighth Circuit has stated that "[t]he date a **debt** is incurred is 'the **date** upon which the debtor first becomes **legally bound to pay**.'" <u>Peltz v. Vancil, Inc. (In re Bridge Info. Sys., Inc.)</u>, 474 F.3d 1063, 1067 (8th Cir. 2007) (emphasis added) (citing <u>Iowa Premium Serv. Co. v. First Nat'l Bank in St. Louis (In re Iowa Premium Serv. Co.)</u>, 695 F.2d 1109, 1111–12 (8th Cir. 1982) (en banc) ("[A] debt . . . is incurred on the date upon which the obligor first become legally bound to pay . . . .")); <u>see also</u> <u>Laws</u>, 98 F.3d at 1051 ("The test for when a debt is incurred is whether the debtor is legally obligated to pay.").  The Bank argues that an overdraft can only be considered a short-term loan/advance of credit at the time Debtor is obligated to pay the Bank.  The Bank asserts that under the applicable law, Debtor is not obligated to repay and does not incur a debt

32

(based on an extension of credit) until a "transfer" to Debtor from the Bank has

occurred.

### 1. For Purposes of Section 547(b) a "Transfer" Does Not Occur Until Final Settlement.

The Bank argues that a 1992 Supreme Court decision is controlling on the

time of a "transfer"—and thus creation of a debt—under § 547(b).  Barnhill v.

Johnson, 503 U.S. 393 (1992).  In Barnhill, the Supreme Court held that a

"transfer" by check occurs under § 547(b) when the check is honored by Debtor's

Bank rather than when it is delivered to payee (recipient of alleged preference).  Id.

at 401–02.  "'[W]hat constitutes a transfer and when it is complete' is a matter of

federal law."  Id. at 398 (quoting McKenzie v. Irving Trust Co., 323 U.S. 365,

369–70 (1945)).  In concluding the time the check is honored should govern, the

Supreme Court noted that "no transfer of any part of the debtor's claim against the

bank [due to the debtor's deposits] occurred until the bank honored the check . . . ."

Id. at 399.  The Supreme Court found that only "when the debtor has directed the

drawee bank [Debtor's Bank] to honor the check and the bank has done so . . ." has

the transfer occurred.  Id. at 400.  The Supreme Court reasoned:

> Myriad events can intervene between delivery and presentment of the
> check that would result in the check being dishonored.  The drawer
> could choose to close the account.  A third party could obtain a lien
> against the account by garnishment or other proceedings.  The bank
> might mistakenly refuse to honor the check.

Id. at 399 (footnote omitted).  "[U]ntil the moment of honor the debtor retains full control over disposition of the account . . . [and the payee of the check (preference defendant)] had received no interest in the debtor's property."  Id. at 401.

When deciding that the time of honor governs, Barnhill relied specifically on U.C.C. § 4-215.  Id. at 399 ("The drawee bank honored the check by paying it. U.C.C. § 1-201(21), 1 U.L.A. 65 (1989) (defining honor); § 4-215(a), 2B U.L.A. 45 (1991).").  Section 4-215 (codified at Iowa Code § 554.4215) contemplates a difference between provisional settlement and final settlement and defines when "[a]n item is finally paid by a payor bank."  U.C.C. § 4-215.

> (a) An item is finally paid by a payor bank when the bank has first done any of the following:
>> (1) paid the item in cash;
>> (2) settled for the item without having a right to revoke the settlement under statute, clearing-house rule, or agreement; or
>> (3) made a provisional settlement for the item and failed to revoke the settlement in the time and manner permitted by statute, clearing-house rule, or agreement.
> (b) If provisional settlement for an item does not become final, the item is not finally paid.
> (c) If provisional settlement for an item between the presenting and payor banks is made through a clearing house or by debits or credits in an account between them, then to the extent that provisional debits or credits for the item are entered in accounts between the presenting and payor banks or between the presenting and successive prior collecting banks seriatim, they become final upon final payment of the item by the payor bank.

U.C.C. § 4-215; see also Iowa Code § 544.4215.  Under the U.C.C., a check is honored when it is paid and a check is paid when the provisional settlement can no

longer be revoked.  U.C.C. §§ 3-502, 4-215(a)–(c), 4-301; <u>see also</u> Iowa Code

§§ 554.3502, 554.4215(1)–(3), 554.4301.  Thus, according to the Bank, when

<u>Barnhill</u> referred to the time of honor, it was referring to the time of final

settlement—only when the settlement is final has the check been honored.  The

Bank thus concludes only at final settlement is the Debtor obligated to repay the

Bank and only then could a debt be created.

Trustee asserts <u>Barnhill</u> does not apply to this case.  Trustee claims <u>Barnhill</u>

is limited to addressing only when a "transfer" by check occurs for § 547(b)

purposes, not when an antecedent debt is created.  Trustee states that "Defendant's

reliance on <u>Barnhill</u> conflates the analysis of check receipt timing with the analysis

of debt creation . . . ." (Resistance to Mot. for Summ. J., ECF Doc. No. 101-1, at

2.)  Trustee suggests that a broader reading of "antecedent debt" is required

because the Bankruptcy Code defines debt as "liability on a claim."  11 U.S.C.

§ 101(12).  Trustee then points out that claim means a "right to payment whether

or not such right is . . . contingent . . . ."  11 U.S.C. § 101(5).

The problem with Trustee's argument is that it is more in line with the

dissent in <u>Barnhill</u> which suggested a much broader definition of "conditional"

transfer.  503 U.S. at 405 (Stevens, J., dissenting).  The dissent argued the delivery

of the check itself could be a "conditional" transfer that was only subject to

ultimate bank action on honor.  <u>Id.</u>  It noted the definitional section of the

35

Bankruptcy Code which states: "'[T]ransfer' means . . . each mode direct or

indirect, absolute or **conditional, voluntary or involuntary**, of disposing of or

parting with [property.]" 11 U.S.C. § 101(54) (emphasis added). According to the

dissent, delivery of the check (which occurs even before provisional settlement)

would have created at law a "conditional" property interest. Id. The majority in

Barnhill, however, rejected a broad interpretation, which arguably makes Trustee's

argument at odds with the majority opinion.

The majority stressed that the meaning of "conditional" in § 101(54) must

not be interpreted too broadly.

> [U]ntil the moment of honor the debtor retains full control over
> disposition of the account and the account remains subject to a variety
> of actions by third parties. To treat petitioner's nebulous right to bring
> suit as a "conditional transfer" of the property would accomplish a
> near-limitless expansion of the term "conditional." In the absence of
> any right against the bank or the account, we think the fairer
> description is that petitioner had received no interest in debtor's
> property, not that his interest was "conditional."

Barnhill, 503 U.S. at 401 (majority opinion) (emphasis added).

The Supreme Court also noted that choosing the time of honor as the time of

transfer was consistent with § 547(e)(2)(A):

> Finally, we note that our conclusion that no transfer of property occurs
> until the time of honor is consistent with § 547(e)(2)(A). That section
> provides that a transfer occurs at the time the transfer "takes effect
> between the transferor and the transferee . . . ." For the reasons given
> above, and in particular because the debtor in this case retained the
> ability to stop payment on the check until the very last, **we do not
> think that the transfer of funds in this case can be said to have**

**"taken effect between the debtor and petitioner" until the moment of honor.**

Id. at 401.

This Court agrees with Trustee that the issue in Barnhill was not identical to the issue here. However, the Court also believes the reasoning employed in Barnhill is relevant to this case. The Supreme Court specifically noted that under the governing U.C.C. process, before the "transfer" to the payee legally occurs under § 547(b), payor's bank still has the ability to honor or dishonor the check, and the payor has the ability to stop payment on the check. The Supreme Court concluded that the U.C.C. process of check clearing must become final before the transfer from the payor to the payee occurs. If the check is not honored, there is no transfer—the check is not paid. Here, if there was any loan from the Bank, as Trustee argues, that loan was only used to cover the payment of the check, which Barnhill suggests does not occur until honor. Thus, the Supreme Court arguably suggests that if the Bank does not honor, there would be no debt incurred by the Debtor.

Even reading Barnhill narrowly, as determining only the time a transfer by check occurs for purposes of § 547(b), as Trustee suggests we do, that narrow reading is supported by a rationale that has implications here. Barnhill at a minimum implies that the applicable U.C.C. process for determining when the transfer is final should be used when determining § 547(b) issues. If that is the

37

case, the Bank had until the midnight deadline (following the U.C.C. process) to

decide whether to extend credit to its customer—and give rise to a debt.

> **2.    Case Law Addressing this Specific Issue—
> Whether an Intraday Overdraft Is an Extension
> of Credit—Is Somewhat Divided.**

Unlike <u>Laws</u> and <u>Barnhill</u>, a number of other cases have addressed the same

issue presented here—whether a provisional settlement in the check clearing

process creates a debt.  They have come to a somewhat mixed result.

> **a.    Case Law Supporting the View that
> Intraday Overdrafts Generally Are
> Not Extensions of Credit**

The Bank cites to several cases supporting its position.  It places heavy

reliance on <u>Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)</u>, 848 F.2d

1196 (11th Cir. 1988).  In that case, the Eleventh Circuit addressed the precise

issue presented here.  An affiliate of the debtor had written a check to a supplier for

which there were insufficient funds in its account.  <u>Chase & Sanborn</u>, 848 F.2d at

1197–98.  The check created an overnight overdraft in the account.  <u>Id.</u>  Under the

U.C.C. clearinghouse rules at issue in that case, Societe Generale, the bank, had

"until noon of the following business day to inform the clearinghouse whether it

will honor or return the check."  <u>Id.</u> at 1197.  The next morning, the bank followed

up with the debtor's affiliate to inquire whether the check would be covered.  <u>Id.</u> at

1198.  The bank was informed there would be an incoming wire transfer to cover

the check.  Id. at 1198, 1201.  The bank then independently confirmed with the

transferor bank that sufficient funds were being sent by wire transfer.  Id. at 1201.

Having determined that the checks would be covered before the deadline to

dishonor, the bank decided to honor the checks.  Id. at 1201.

In Chase & Sanborn, the Trustee sought to recover the amount sent by wire

transfer as a preferential transfer.  Trustee claimed the bank's temporary allowance

of an overdraft was an extension of credit to debtor which created a debt.  Id.

Trustee argued the subsequent wire transfer was a preferential repayment of that

debt.  The Eleventh Circuit analyzed the issue as follows:

> If we determine that the paper overdraft created by the events of
> November 29 and November 30 constituted a debt owed to [debtor's
> bank] by [debtor], then the money wired to [debtor's bank]-for the
> express purpose of paying off the overdraft-would actually have been
> sent to [debtor's bank].  If this is the case, then [debtor's bank] had
> actual control of the funds when it received the money from C & S
> [bank making wire transfers], and [trustee] can recover the money
> from the bank.  If, on the other hand, there was no real debtor-creditor
> relationship, then the bank merely deposited the funds into [debtor's]
> account, and [debtor] used that money to pay the check to Banco
> Popular.  When viewed in that manner, [debtor's bank] functioned as
> a conduit, receiving the funds and depositing them into the [debtor's]
> account.  Then, [trustee] would be unable to recover the money from
> [debtor's bank].

Id. at 1200–01.

The Eleventh Circuit then concluded debtor's bank was merely a "conduit"

for the transfer of funds, not a transferee.  Id. at 1201.  The circuit agreed with the

lower court "that the transaction was effectively simultaneous."  Id.  "[T]he bank

was a conduit that 'credit[ed] [the Debtor's affiliated] account with the transferred funds expressly earmarked for that purpose.'" Id. (quoting Nordberg v. Societe Generale (In re Chase & Sanborn), 68 B.R. 530, 532 (S.D. Fla. 1986), aff'd, 848 F.2d 1196 (11th Cir. 1988)).  In Laws, the Eighth Circuit cited Chase & Sanborn on this very issue: "a debt will arise if deposited checks are dishonored. But until dishonor, a bank that advances funds in the expectation that deposits will routinely be collected acts as a conduit for the depositor's financial transactions, not as a creditor."  98 F.3d at 1051 (citing Chase & Sanborn, 848 F.2d at 1201).

Other courts have also found that intraday overdrafts should not be considered extensions of credit.  In Jacobs v. State Bank of Long Island (In re AppOnline.com), 296 B.R. 602 (Bankr. E.D.N.Y. 2003), the bankruptcy court firmly rejected the notion that an intraday overdraft caused by a day one provisional settlement for which the bank received new replacement funds before the midnight deadline is an extension of credit.  See also Morin v. HSBC Bank USA (In re Aapex Sys., Inc.), Bankr. Nos. 98-20728, 00-2073, 2004 WL 2898130, at *3 (Bankr. W.D.N.Y. Dec. 14, 2004) (applying AppOnline.com and finding provisional settlements causing intraday overdrafts which are cured before the midnight deadline do not constitute extensions of credit); Bernstein v. Alpha Assocs., Inc. (In re Frigitemp Corp.), 34 B.R. 1000 (S.D.N.Y. 1983), aff'd, 753

40

F.2d 230 (2d Cir. 1985).[5]  In AppOnline.com, the court relied on the following

rationale:

> To treat the NSF position [day one] in the Disbursement Account as
> an extension of credit flies in the face of banking law and practices, as
> well as common sense.  Any debtor-creditor relationship can only
> arise with the consent of both parties.  If a bank wishes to permit an
> account holder to write checks in excess of its balance, it does so by
> providing an overdraft facility.  In such a case, the bank has consented
> in advance to honor checks presented in excess of the balance of the
> account, up to a specified limit, and a debtor-creditor relationship
> arises when the customer overdraws the account pursuant to the terms
> of the overdraft facility.
>
> By contrast, in this case, State Bank specifically declined to provide
> any type of credit facility to Island Mortgage.  It honored the $7.3
> million of checks that cleared on June 6 [day 2] because-and only
> because-$7.3 million had been deposited in the Disbursement Account
> to fund those checks, all unfunded checks were dishonored.  This is
> not an extension of credit by a bank to its customer, nor was there a
> debtor-creditor relationship established by these facts.
>
> If the concept of provisional settlement as between the bank and its
> customer were eliminated, stop payment orders, garnishments and set-
> offs would all be ineffective if they arrived at the payor bank after
> forward settlement has been made with its presenting bank but before
> the payor bank has determined whether or not to honor the check, and
> the concept of the midnight deadline would, in effect, cease to exist.
> As noted in Official Comment 5 to UCC § 4–301: "Obviously the
> section [4–301] assumes that the item has not been 'finally paid'
> under Section 4–213(1).  If it has been, this section has no operation."
> See also the Official Commentary on Regulation CC, which states that
> Regulation CC "does not relieve a paying bank from the requirement
> for timely return (i.e., midnight deadline) under UCC §§ 4–301 and 4–
> 302, which continue to apply."   Reg. CC Commentary Section
> 229.30(a)(9), IV FRRS ¶ 9–364–1. Accord, Bailey & Hagedorn,
> Brady on Bank Checks ¶ 25.09 fn. 121 ("The midnight-deadline limits

---

[5] The Eighth Circuit relied on Frigitemp in Laws.  See Laws, 98 F.3d at 1051.

41

for return of an unpaid check by the paying bank under UCC §§ 4–301(1) and 4–302(a) are expressly continued under Regulation CC.")

If the Trustee's theory were to prevail and the well-settled concepts of "provisional settlement" and the "midnight deadline" provided for in UCC §§ 4–213, 4–301 and 4–302(a) were eviscerated by a bankruptcy trustee's avoidance powers, the policy favoring the ready negotiability of checks and other instruments would affect the movement of checks along the highway of commerce.   The trustee's avoidance powers should not have the unintended consequences of frustrating the purposes of Article 4 of the Uniform Commercial Code, state statutes and Regulation CC.

AppOnline.com, 296 B.R. at 619; see also Laws, 98 F.3d at 1051–52 (providing

similar rationale noting that a rule treating provisional advances as an extension of

credit "would be inconsistent with the parties' expectations and their view of the

banking relationship" and "such a rule might cause banks to terminate a service

that is invaluable in today's economy").

The Southern District of California seemed to reach the same conclusion.

Pioneer Liquidating Corp. v. San Diego Trust & Sav. Bank (In re Consolidated

Pioneer Mortg. Entities), 211 B.R. 704 (S.D. Cal. 1997), aff'd in part, rev'd in part

on other grounds, 166 F.3d 342 (Table), Unpublished Disposition, Text at 1999

WL 23156 (9th Cir. 1999).  In that case, the district court was confronted with both

collected funds overdrafts (i.e., extending or advancing credit against uncollected

funds) and intraday overdrafts (extending credit for which there were insufficient

funds and allowing the customer to make a covering deposit).  The court noted:

42

Undisputed evidence at trial established that Pioneer regularly wrote checks against its SDT accounts that lacked sufficient funds to cover the amount of the checks. The Bank regularly called Pioneer—almost on a daily basis—to say that it needed a deposit to "cover" the amount of the checks presented for payment the previous day. So long as a Pioneer representative brought in a "covering deposit," SDT paid the incoming checks. Pioneer always made a covering deposit, and, frequently, the checks deposited were drawn on other Pioneer accounts held at SDT or other San Diego banks.

Id. at 708. While the court's opinion was mostly focused on advances against collected funds balances, the court concluded there were no recoverable transfers, implying there were no recoverable transfers even for ledger balance overdrafts. In affirming the district court, the Ninth Circuit cited Laws and stated: "When the Bank allowed Pioneer to write checks from accounts with insufficient funds, and then make covering deposits, it was offering a service to a customer, rather than establishing a creditor-debtor relationship." Pioneer Liquidating Corp. v. San Diego Trust & Sav. Bank (In re Consolidated Pioneer Mortg. Entities), 166 F.3d 342 (Table), Unpublished Disposition, Text at 1999 WL 23156, at *1 (9th Cir. 1999).

Perhaps the strongest endorsement of this position came in a pre-Code case, Bernstein v. Alpha Associates, Inc. (In re Frigitemp Corp.), 34 B.R. 1000 (S.D.N.Y. 1983). In Frigitemp, the court strongly suggested that banks should be treated differently than other creditors when it comes to preference liability. The court reasoned:

43

> A bank performs a fundamentally different role than other competing
> creditors when it uses credit as a mechanism to facilitate payment and
> collection.  In fact, overdraft credit should not be equated with other
> forms of credit in bankruptcy law, since it typically goes to pay
> creditors who would otherwise become general creditors.

Id. at 1020 (citing Butz v. Banchoio Nat'l Bank, 31 B.R. 893, 894 (Bankr. S.D.

Ohio 1983).  The court explained:

> Extensions of overdraft credit are in fact often a necessary
> complement to a bank's other services.  Overdraft privileges provide a
> cushion to absorb shortages due to error or imperfect cash
> management synchronization and such privileges prevent countless,
> needless dishonors of corporate checks for insufficient funds.  If each
> routine deposit occurring when a company's account is in the
> overdraft position were voidable as a preference, banks would
> potentially be exposed to substantial liabilities, or would modify their
> procedures by increasing the costs of preclearing checks for all
> customers, or by discontinuing the useful practice of permitting
> overdrafts.   Moreover, attaching preference liability to overdrafts
> would lead to premature freezing of accounts.  Like the termination of
> basic utilities, premature termination of such essential payment and
> collection services at the first suggestion of insolvency would turn
> many a lean spell for companies into sure bankruptcy.  In the end,
> such a rule would hurt more creditors than it would help, "would in
> many cases make banks hesitate to honor checks given to third
> persons, would precipitate bankruptcy and so interfere with the course
> of business as to produce evils of serious and far-reaching
> consequence."  Studley v. Boylston National Bank, 229 U.S. 523,
> 529, 33 S. Ct. 806, 808, 57 L. Ed. 1313 (1913) (discussing the need to
> preserve bank's right of set-off).

Id. at 1020.  While the case was technically decided under the old Bankruptcy Act,

in reaching its conclusions, Frigitemp also discussed how it thought overdrafts

were treated in the new Bankruptcy Code:

> The Bankruptcy Code provision that now governs such credit, and
> which was adopted after overdraft credit had become an established
> banking device, excuses current transactions from preference liability
> and makes banks liable for such overdrafts only to the extent they are
> not repaid within forty-five days.  <u>See</u> <u>Butz v. Bancohio National
> Bank</u>, 31 B.R. 893 (Bkrtcy. S.D. Ohio 1983); <u>In re Schmidt</u>, 26 B.R.
> 89 (Bkrtcy. D. Minn.1982).  Though we are not bound by the Code to
> except overdraft credit from preference liability, the new law is surely
> an appropriate indication of the proper public-policy balance to strike
> in resolving the trustee's inventive claim.

<u>Id.</u> at 1020–21.  This statement about repayment in forty-five days is a reference to

§ 547(c)(2), which originally required that transfers in the ordinary course of

business be "made not later than 45 days after such debt was incurred." 11 U.S.C.

§ 547(c)(2)(b) (1978) (amended 1984) (removing the forty-five day limitation).

Thus, <u>Frigitemp</u> held the unique nature of the banking relationship meant that

overdrafts should not be considered extensions of credit for preferential transfer

purposes.  Even if overdrafts could technically be considered preferential transfers,

<u>Frigitemp</u> seemed to concluded that under the "new" Bankruptcy Code, overdrafts

would probably qualify for the ordinary course of business exception in

§ 547(c)(2).

This Court takes particular notice of <u>Frigitemp</u> because the Eighth Circuit

relied on it in <u>Laws</u>.  <u>See</u> <u>Laws</u>, 98 F.3d at 1051 (citing <u>Frigitemp</u>, 34 B.R. at

1020).  In its conclusion on the antecedent debt issue in <u>Laws</u>, the Eighth Circuit

suggested that courts should be wary about adopting rules which "might cause

banks to terminate a service that is invaluable in today's economy."  <u>Id.</u>

45

### b. Case Law Supporting the View that Intraday Overdrafts Are Extensions of Credit

The Trustee has cited to several other cases he believes supports his position. The most recent case is Feltman v. City National Bank of Florida (In re Sophisticated Communications Inc.), 369 B.R. 689 (Bankr. S.D. Fla. 2007).  In Sophisticated, the bankruptcy court held that the ledger balance overdraft created by the issuance of cashier's checks against an account with insufficient funds was an extension of credit which created an antecedent debt.  Sophisticated, 369 B.R. at 700–01.  Because there was an antecedent debt, the later deposits which covered the ledger balance overdraft were avoidable as preferential transfers.  Id. at 701. Sophisticated distinguished Chase & Sanborn.  In particular, Sophisticated found that unlike regular checks, the bank could not dishonor the cashier's checks at any time during the U.C.C. process or at least the bank had "failed to prove it could have dishonored the cashier's checks."  Id.  The cashier's checks were issued by the bank and therefore it would have been on notice of the insufficient funds balance when issuing the checks.  Id.  The court found the bank had issued the cashier's checks "based solely on the Debtor's assurance that deposits would be made the following day.  By doing so, [the bank] incurred a credit risk and the overdraft is properly characterized as a debt."  Id.

In addition, the Sixth and Seventh Circuits have held that the use of
provisional credits—even those created by advances against uncollected funds—
can create a debt for bankruptcy purposes.  <u>McLemore v. Third Nat'l Bank in
Nashville (In re Montgomery)</u>, 983 F.2d 1389 (6th Cir. 1993); <u>Matter of Prescott</u>,
805 F.2d 719 (7th Cir. 1986).  In <u>Matter of Prescott</u>, the Seventh Circuit held that
repayment of overdraft balances with subsequent deposits was the repayment of an
antecedent debt.  <u>Prescott</u>, 805 F.2d at 729–30.  The Seventh Circuit distinguished
between deposits which are freely withdrawable and deposits which are credited by
the bank toward negative account balances.  <u>Id.</u>

> The depositor does not have freedom to withdraw when the deposit is
> applied as payment for an antecedent debt.  As the court said in <u>Miller
> v. Wells Fargo Bank International Corp.</u>, 406 F. Supp. 452 (S.D.N.Y.
> 1975):
>
>> If the deposit is accepted by the bank with an intent to
>> apply it "on a pre-existing claim against the depositor
>> rather than to hold [it] subject to the depositor's checks in
>> ordinary course," . . . the deposit is viewed legally as a
>> transfer in payment of the debt.  As such, it may be
>> recovered by the trustee where the elements of a voidable
>> preference are otherwise satisfied.
>
> <u>Id.</u> at 467, <u>aff'd</u>, 540 F.2d 548 (2d Cir. 1976); <u>see also</u> <u>Katz</u>, 568 F.2d
> at 970.
>
> Here, to the extent the deposits compensated for overdrafts, they were
> payments on an obligation.  Prescott had no right to keep using the
> money deposited.  Nor does it matter that the bank was tolerant of
> Prescott's overdrafts.  That the bank had earlier allowed Prescott to
> maintain overdrafts does not mean that Prescott had a right to
> continue the practice.  Therefore the trustee could avoid deposits that

were applied against Prescott's March 16 overdrafts insofar as they preferred Marine and indirectly preferred Gateway over other creditors.

Prescott, 805 F.2d at 729.

Trustee also cites In re Montgomery, 983 F.2d 1389 (6th Cir. 1993).  In Montgomery, the Sixth Circuit upheld the lower court's ruling that advances against uncollected funds are a type of loan.  Montgomery, 983 F.2d at 1394.  The debtor there was engaged in a check-kiting scheme in which the debtor would write himself a bad check and then use the provisional credit to write another check.  Id.  The court found that, despite the fact "that the credits were provisional and subject to being revoked," the credits had been used by the Debtor and therefore the repayment of those loans constituted a voidable preference.  Id. at 1394–95.

### c.   The Cases Supporting Trustee's Position Are Distinguishable.

This Court believes that Prescott, Montgomery, and Sophisticated are distinguishable from this case.  Prescott did not involve the same "intraday" time issues.  While the court in Prescott did find the debtor's repayment of overdrafts to be repayment of a debt, those overdrafts appear to have extended over longer periods—the record does not show next day repayment before the midnight deadline.  That is critical to this case.  Even the Bank here recognizes that "true overdrafts" are extensions of credit.  Chase & Sanborn discussed and distinguished

48

the bankruptcy court decision in <u>Prescott</u> for similar reasons noting that unlike the

bank in <u>Prescott</u>, "the bank [in <u>Chase & Sanborn</u>] did not honor the check in 'the

faith that the next day or two's deposits would right the balance.'"  <u>Chase &</u>

<u>Sanborn</u>, 848 F.2d at 1201 (citing <u>Matter of Prescott</u>, 51 B.R. at 753).  <u>Prescott</u>

simply did not address the same provisional settlement and intraday timing

questions presented here.

 <u>Montgomery</u> is distinguishable primarily because its broad holding that all

overdrafts, including advances against uncollected funds, are extensions of credit is

at odds with <u>Laws</u>.  In <u>Laws</u>, the Eighth Circuit rejected treating provisional credits

advanced against uncollected funds as a debt and specifically declined to follow

<u>Montgomery</u>.

> The trustee relies on <u>In re Montgomery</u>, 123 B.R. 801
> (Bankr.M.D.Tenn.1991), <u>aff'd</u>, 136 B.R. 727 (M.D. Tenn. 1992),
> <u>aff'd</u>, 983 F.2d 1389 (6th Cir. 1993).  Although we disagree with
> broad language in the opinions in that case, we agree with the result.
> Montgomery involved a bank that granted a check-kiting depositor a
> $500,000 line of credit to cover ledger overdrafts in a checking
> account.  <u>See</u> 123 B.R. at 811.  Draws on that line of credit, like any
> other, created depositor debt for preference purposes.

<u>Laws</u>, 98 F.3d at 1051 n.4.  Moreover, the parties' relationship in <u>Montgomery</u> was

not that of a normal checking account.  Instead, the parties had deliberately setup a

cash management system.  <u>See</u> <u>McLemore v. Third Nat'l Bank in Nashville (In re</u>

<u>Montgomery)</u>, 123 B.R. 801, 803–07 (Bankr. M.D. Tenn. 1991), <u>aff'd</u>, 136 B.R.

727 (M.D. Tenn. 1992), <u>aff'd</u>, 983 F.3d 1389 (6th Cir. 1993).  Thus, not only is

Montgomery at odds with Laws, the parties' relationship in Montgomery seems to be the sort of special relationship noted in Laws, in which the parties through a special agreement might change the default rules and convert the provisional credits on uncollected funds into extensions of credit.

The court in Sophisticated distinguished its own case from Chase & Sanborn, an Eleventh Circuit case which would have been binding on the lower court. Sophisticated, 369 B.R. at 700–01. In particular, Sophisticated dealt with cashier's check rather than regular checks. Unlike regular checks settled through the clearinghouse, which the bank only learns of on day two after a provisional settlement has occurred, a bank knows of the cashier's checks it issues immediately. When issuing a cashier's check, the issuing bank guarantees payment of the funds and immediately withdraws the funds to cover the check from the customer's account. Thus, at the time of issuing the checks, the payor bank knew or should have known there were insufficient funds on deposit and knew it was taking a credit risk.

Importantly, the Sophisticated court also found there was not the same sort of transaction subject to dishonor. 369 B.R. at 701. In contrast, under the automated settlement process, the bank does not learn of an overdraft caused by a regular check (assuming it is presented at a different bank) until the provisional settlement has been made through the clearinghouse. Unlike the cashier's checks

50

in <u>Sophisticated</u>, this case involves clearinghouse transactions that give the bank

the ability to decide whether to accept the customer's assurance that deposits will

be made only after a provisional settlement.

> ### V.   While the Bank Is Largely Correct on the Law, There Are Genuine Issues of Material Fact About Whether There Were Extensions of Credit by the Bank.

>> #### A.   Finding Intraday Overdrafts Generally Do Not Constitute Extensions of Credit Is More Consistent With the U.C.C., <u>Laws</u>, and <u>Barnhill</u>.

Whether an intraday overdraft may constitute a debt for preferential transfer

purposes is certainly a complicated and difficult question on which courts have

disagreed.  After carefully examining the case law, this Court concludes that cases

holding no debt is created by a provisional settlement alone are the most

persuasive.  <u>Laws</u> in particular provides strong indication that no debt is created by

provisional settlements.  <u>Laws</u> noted: "Other courts have consistently refused to

hold that the mere extension of provisional credit creates a bankruptcy debt."  98

F.3d at 1050 (citing <u>Frigitemp</u>, 34 B.R. at 1015–16 and other cases).  <u>Laws</u> holds:

"True, a debt will arise if deposited checks are dishonored.  But until dishonor, a

bank that advances funds in the expectation that deposits will routinely be

collected acts as a conduit for the depositor's financial transactions, not as a

creditor." (citing <u>Chase & Sanborn</u>, 848 F.2d at 1201).  <u>Laws</u> strongly suggests the

time of honor, not the time of posting, is the point at which a debt would be created.

Finally, <u>Laws</u> strongly warns against adopting a rule which "would pin banks between the strong federal policy in favor of expedited funds availability and a Bankruptcy Code that treats advances as loans and their reduction as preferences." <u>Laws</u>, 98 F.3d at 1051.  As in <u>Laws</u>, holding that intraday overdrafts are all recoverable as preferential transfers "would immensely [and unnecessarily] complicate many bankruptcy proceedings." <u>Id.</u>

<u>Chase & Sanborn</u>, <u>AppOnline.com</u>, and <u>Frigitemp</u> all address the exact issue presented in this case and find there is no extension of credit.  This Court finds the analyses in of those three cases to be persuasive in their own right—but even more so because they are either cited by <u>Laws</u> or use identical rationale.  This result is firmly in line with the U.C.C. banking provisions, which contemplate the ability to dishonor a check provisionally settled on day one by final action on day two.  The result is also in line with the Supreme Court's decision in <u>Barnhill</u>, which found that, for purposes of § 547(b), a transfer occurs at the time of honor, which is the time a settlement becomes final.  The rationale of the majority in <u>Barnhill</u> reflects the rationale of the Bank.  The rationale of the dissent is essentially the rationale upon which the Trustee relies.

Based on the above analysis, this Court concludes that routine intraday overdrafts, standing alone, are not extensions of credit provided they are covered or reversed before the midnight deadline on day two. In spite of this Court's conclusion, however, there are still genuine issues of material fact about whether the provisional settlements became real overdrafts and created antecedent debt. Those genuine fact issues fall into two separate categories described in the following sections.

### B.    Genuine Issues of Fact Remain Regarding the Special Agreement Exception Noted in <u>Laws</u>.

<u>Laws</u> noted a bank and its customer could explicitly modify their relationship by special agreement to make the provisional settlements into loans. <u>Laws</u>, 98 F.3d at 1051. In fact, <u>Laws</u> reversed summary judgment for the bank and remanded because some documents and additional facts in the record indicated the parties may not have had a routine relationship, and may in fact have intended to apply a different rule and extend credit. <u>Id.</u>

At first blush, the facts presented in this case seem to warrant the same conclusion. Moreover, this part of the <u>Laws</u> analysis seems to be in line with the U.C.C., which contemplates that an agreement between the parties may modify the statutory scheme for provisional settlements. <u>See</u> Iowa Code §§ 554.4103, 554.4215, 554.4402; U.C.C. §§ 4-103, 4-215, 4-402. However, Iowa law appears to require more than suggested by <u>Laws</u>.

53

Under Iowa law, "[t]he relationship between a bank and its customer is based on contract."  Clinton Nat'l Bank v. Saucier, 580 N.W.2d 717, 719 (Iowa 1998) ("Absent an express agreement of the parties to the contrary, the provisions of Article 4 of the Uniform Commercial Code (UCC) governing bank deposits and collections are made express provisions of the depositor's contract with the bank."); see also Davis Mobile Homes, L.L.C. v. U.S. Bank Nat'l Ass'n, 824 N.W.2d 562 (Table), Unpublished Disposition, Text at 2012 WL 5356132 (Iowa Ct. App. 2012) (citing Saucier, 580 N.W.2d at 719).  When it comes to overdraft agreements, the Iowa Supreme Court held that Iowa Code section 535.17 provides special "statute of frauds" requirements for credit agreements.  Saucier, 580 N.W.2d at 720.  The Iowa Supreme Court found: "[The Iowa] legislature in 1990 chose to impose a more stringent requirement concerning a bank's duty to honor overdrafts than that called for by Article 4 [of the U.C.C.]."  Id.  The Iowa Supreme Court then clarified the general rights of the bank and customer regarding overdrafting under Iowa law:

> Defendants' alleged agreement with the Bank concerning overdrafts thus falls under the parameters of section 535.17(1).  The statute clearly requires that an **agreement concerning a bank's duty to honor overdrafts must be in writing to be enforceable**.  Therefore, assuming that the Bank did make oral statements to Saucier that it would honor defendants' overdrafts, such statements are immaterial because the law provides that such agreements must be in writing to be enforceable.  Defendants do not assert any such written agreement exists here.

54

Furthermore, the fact that the Bank honored defendants' overdrafts in the past does not make the Bank obligated to honor future overdrafts. The rule is well-established that a bank has no duty to honor overdrafts, although it may have done so in the past.  See Orlich v. Rubio Sav. Bank of Brighton, 240 Iowa 1074, 1078, 38 N.W.2d 622, 624 (1949) (fact that bank paid overdrafts in past did not require bank to continue to honor future overdrafts); Schaller v. Marine Nat'l Bank of Neenah, 131 Wis.2d 389, 388 N.W.2d 645, 648–49 (Wis.Ct.App.1986) (same).  This is because the decision whether to honor an overdraft is a matter of discretion for the bank.  Schaller, 388 N.W.2d at 648; see also 11 Am. Jur. 2d Banks & Financial Institutions § 939 (1997) (whether to honor a check that creates an overdraft is a matter within the bank's discretion). As the Louisiana supreme court has said:

> A man may allow credit to another, if he sees fit to do so, but this does not oblige him to extend that credit at any and all times thereafter. The banker, like the butcher, the baker, and the grocer, extends credit when he thinks the customer is good for the amount of the credit, but he shuts it off when he thinks the customer is no longer able to respond to his obligations . . . .

Canal Bank & Trust Co. v. Denny, 172 La. 840, 135 So. 376, 377 (1931).

Saucier, 580 N.W.2d at 720–21 (emphasis added).  Thus, while Laws holds that a special agreement may convert intraday overdrafts into short-term loans, Iowa law appears to require any such agreement to be in writing.  The Court is unclear whether any written agreements or terms govern the relationship of the parties here.  This is not something which the parties have briefed.

There certainly are facts in the record showing the parties may have had an arrangement that differed from the general rules.  Trustee has pointed to facts

showing Debtor and the Bank had a special relationship and/or special agreement.

The Bank treated the Debtor differently than other customers.  This provides an

inference that the allowance of large intraday overdrafts was a special favor to

Debtor—and perhaps one to which they explicitly agreed.  Moreover, the record

shows that during the preference period the Bank began charging the Debtor

overdraft fees and "account analysis charges."  (Resistance to Mot. for Summ. J.,

ECF Doc. No. 101-1, at 16.) (citing Def.'s Resp. to Interrog. No. 12 and Dep. of

Collin Cook).  In total, the Bank charged overdraft fees of "over $22,000" and

"account analysis charges" of "$8,135."  Id.  The Bank has provided insufficient

explanation for these charges and why they appeared to start only in the run-up to

bankruptcy.  These facts certainly support an inference that the relationship of the

parties may have been a lending relationship or changed into one during Debtor's

slide toward bankruptcy.  The question remains whether there is any

documentation or writing setting the specific terms.

The record also shows that the relationship between the Bank and Debtor

was different than the standard banking relationship.  The Bank says it required

Debtor to keep significant funds on deposit in account 367788 and that was

intended to provide "security" for the checks written on account 1430.  (Statement

of Material Facts Not In Dispute, ECF Doc. No. 85, at 2.)  At the hearing, the Bank

termed this a "sweep account" where the funds from account 367788 could be used

56

to cover a negative fund balance in account 1430, should they be needed.  In its

Statement of Material Facts Not In Dispute, the Bank described account 367788 as

money "held as security."  (ECF Doc. No. 85, at 2.)  This also supports an

inference that account 367788 could very well have been treated as collateral for

the extensions of credit (short-term loans) from the Bank.  While the Bank did,

eventually, move the funds in 367788 to account 1430, the Bank did not indicate

what in particular triggered the move or whether it was a setoff.  The factual

question that remains is whether there is a written agreement setting out special

terms for this account.

     The facts also show that in the lead up to bankruptcy, the Debtor began to

overdraft its account with increasing frequency and in increasing amounts.  This

pattern is consistent with the sort of on-going credit relationship found in

Montgomery.  Just as in Laws, some of the facts in this record suggest the

relationship of the parties in this case "began to reflect a banking relationship

having many indicia of a loan."  Laws, 98 F.3d at 1052.  However, under Iowa law

more than inferences and indicia of a loan agreement are required.  There needs to

be a written agreement.  Whether any such written agreement or even a series of

writings exist to establish the specific contours of the relationship between the

Bank and the Debtor is unclear from this record.  As such, the Court cannot say the

Bank is entitled to judgment as a matter of law.

### C.  Genuine Issues of Fact Remain Regarding Whether There Were "True Overdrafts" that Can Be Recovered by the Trustee.

Even the Bank's cases, experts, and its own briefing have acknowledged: "Overdrafts have traditionally been considered debts."  <u>Chase & Sanborn</u>, 848 F.2d at 1200 (citations omitted); <u>see also</u> <u>Saucier</u>, 580 N.W.2d at 720 ("[U]nder Iowa law payment by a bank of an overdraft is considered an unsecured loan . . . and/or an extension of credit to a customer.") (citations omitted).  The Bank and its experts point out that this rule applies only when there are "true overdrafts."  In simplest terms, they have argued— and this Court has largely agreed—that "true overdrafts" do not occur solely as a result of a provisional settlement.  However, it is well-established that provisional settlement amounts that are not cured or zeroed out by the midnight deadline do become "true overdrafts" and thus extensions of credit.  There are key questions of material fact about the amount of "true overdrafts" that occurred in the preference period.

Trustee's expert, Jolene Topinka, submitted both a report and deposition testimony where she indicated that even applying the Bank's formula, there were still many "true overdrafts" or "overnight overdrafts" on a number of different days during the preference period.  The exhibit to her report details each of those banking days and her finding for the day of whether or not a "true overdraft" occurred.  The report showed twenty-three days of "true overdrafts."  Those "true

58

overdrafts" ranged in amounts from negative $8,212.36 to $842,594.53. The total of all those "true overdrafts" is negative $7,890,538.37. Based on Ms. Topinka's analyses, it is clear that the Bank allowed the Debtor to maintain some actual overdrafts. The Court's independent analysis of the ledger statements for account 1430 the Trustee attached to his Complaint came up with similar numbers to those in Topinka's report. Therefore, even under the most generous definition for the Bank of when a "true overdraft" occurs,[6] there is significant evidence the Bank did extend credit, and perhaps a very great amount of credit, to the Debtor.

The parties spent little time addressing this issue so the record is less than clear on the significance of these "true overdrafts." The parties have not addressed whether these "true overdrafts" are recoverable, and if so, in what amount. This effects several other issues in the case including: the possible special banking agreement of the parties and the terms, the contemporaneous new value or subsequent new value defenses, the ordinary course of business defense, and what amount of the true overdrafts the Trustee can recover. At a minimum, this raises significant factual issues for trial. Summary judgment is inappropriate for this reason and the others noted above.

---

[6] It is not at all clear to the Court that it is appropriate to offset the $1,400,000.00 in account 367788 against the overdrafts in account 1430 when calculating the "true overdrafts." However, there is no need to consider the issue at this time. Since the account still shows "true overdrafts," even when giving the Bank the benefit of the $1,400,000.00, which is the most generous to the Bank, there is an issue for trial as to the amount of "true overdrafts."

## VI.    The Bank's Motion for Summary Judgment on Its § 547(c) Affirmative Defenses

The Bank has also argued it is entitled to summary judgment on its affirmative defenses under § 547(c).  The Bank has argued there is no genuine issue of material fact regarding whether the payments received from Debtor were in the ordinary course of business and/or made according to ordinary business terms under § 547(c)(2).  The Bank also argues that the undisputed record shows there was a contemporaneous exchange of new value under § 547(c)(1).

### A.    Fact Issues on Affirmative Defenses Under § 547(c)(2)

Section 547(c)(2) provides that a trustee may not avoid a transfer:

> (2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was—
>
>> (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or
>>
>> (B) made according to ordinary business terms;

 "[T]he policies underlying the ordinary business exception are two-fold: (1) to encourage creditors to continue dealing with troubled debtors, and (2) to promote equality of distribution."  Harrah's Tunica Corp. v. Meeks (In re Armstrong), 291 F.3d 517, 527 (8th Cir. 2002) (citing Union Bank v. Wolas (In re ZZZZ Best Co.), 502 U.S. 151, 161 (1991)).

The Bank first needs to show that the debt itself was "ordinary for both parties." Hanrahan v. Grundy Cnty. Farm Serv. Agency (In re Walterman Implement, Inc.), Bankr. No. 05-07284, Adv. No. 07-09039, 2007 WL 4224041, at *2 (Bankr. N.D. Iowa Nov. 27, 2007) (citing Armstrong, 291 F.3d at 527).  The Bank next needs to prove that the transfer was either in the ordinary course of the business relationship between the Debtor and the Bank, or that the transfer was "made according to ordinary business terms."  11 U.S.C. § 547(c)(2); Schnittjer v. Pickens (In re Pickens), Bankr. No. 06-01120, Adv. No. 06-09166, 2008 WL 63251, at *3 (Bankr. N.D. Iowa Jan. 3, 2008).  The transfer is in the ordinary course of the debtor and creditor's business relationship when it is "consistent with the pattern of previous transfers between the parties." Pickens, 2008 WL 63251, at *3.  Alternatively, a creditor can prove that the transfer happened according to ordinary business terms by providing information about industry practice and then showing that the transfer occurred according to those industry practices.  Id.

Given the above analysis relating to a possible special overdrafting agreement between the parties, there are many material questions of fact about just what the ordinary course of business between the Bank and Debtor was in this case.  It is equally unclear whether the relevant transfers were made according to ordinary business terms—or highly unique terms applicable only to this relationship or possibly even consistently changing terms the more Debtor slid

toward bankruptcy.  It is undisputed that the sheer amount and frequency of checks Debtor wrote for which it had insufficient funds increased sharply during the preference period.  It is unclear what, if any, actions the Bank took and what actions might have been considered necessary in the industry given these facts.  As the Trustee noted at the hearing, he has presented expert opinions noting it is highly unusual for a bank to allow a customer to so frequently overdraft its account and in such large amounts.  Because there are material disputes as to what constitutes ordinary terms and the ordinary course of business, summary judgment on these grounds is inappropriate.

## B.   Fact Issues on Affirmative Defense Under § 547(c)(1)

The Bank also argues that the transfers cannot be avoided because under § 547(c)(1) any payments the Bank received were part of a "contemporaneous exchange for new value" and were so intended.  In order to prevail on that defense, the Bank must prove (1) each party intended the exchange to be contemporaneous, (2) that it was substantially contemporaneous, and (3) that the debtor received new value.  11 U.S.C. § 547(c)(1); Silverman Consulting, Inc. v. Canfor Wood Prods. Mktg. (In re Payless Cashways, Inc.), 306 B.R. 243, 249 (B.A.P. 8th Cir. 2004). Section 547(a)(2) of the Bankruptcy Code defines new value.  "New value means money, or money's worth in goods, services, or credit, or release by transfer of property previously transferred to such transferee . . . but does not include an

62

obligation substituted for an existing obligation."  11 U.S.C. § 547(a)(2).  A debtor

who pays funds to a creditor to pay an antecedent debt has not received new value.

Manchester v. First Bank & Trust Co. (In re Moses), 256 B.R. 641, 652 (B.A.P.

10th Cir. 2000).  "[T]he mere satisfaction of an antecedent debt is not 'new value'

under § 547(a)(2)."  Id.

Section 547(c)(1)(B)  specifies the exchange must be "in fact a substantially

contemporaneous exchange."  "'The modifier 'substantial' makes clear that

contemporaneity is a flexible concept which requires a case-by-case inquiry into all

relevant circumstances.'"  Lindquist v. Dorholt (In re Dorholt, Inc.), 224 F.3d 871,

874 (8th Cir. 2000) (quoting Pine Top Ins. Co. v. Bank of Am. Nat'l Trust & Sav.

Ass'n, 969 F.2d 321, 328–29 (7th Cir.1992)) (agreeing with the Seventh and Ninth

Circuits and adopting a case-by-case determination of whether a transfer was

"substantially contemporaneous"); see also Dean v. Davis, 242 U.S. 438 (1917)

(finding a mortgage given seven days after the underlying debt was created to be

"substantially contemporaneous" and therefore not a preference).

The Bank argues it provided the new value through continuing to extend

banking privileges and additional provisional settlements to Debtor.  The Bank

argues the exchanges were both intended to be and were in fact "substantially

contemporaneous."  The Bank's argument here has some facial appeal given the

volume of daily transactions.  However, whether all the transactions (provisional

and "true" overdrafts) were substantially contemporaneous exchanges is itself not

apparent.  No party has described in any way which wire transfers paid particular

checks or groups of checks.  Thus, it is impossible to determine if certain

exchanges were substantially contemporaneous or not contemporaneous at all.

Again, at a minimum, giving all inferences to the Trustee as the non-moving party,

the record is entirely unclear about what transfers are linked to each other, how

they are contemporaneous, how they provided new value, and if so in what

amounts.  Therefore, summary judgment is inappropriate on the Bank's affirmative

defenses under § 547(c).

### VII.   The Amended Complaint Relates Back to the Original Complaint

On October 24, 2008, the Bank transferred the $1,400,000.00 deposited in

account 367788 into account 1430.  The Trustee added a § 553 setoff claim in his

Second Amended Complaint to recover at least that amount.  The Bank argues

Trustee's setoff claim fails as a matter of law.

The Bank first argues that summary judgment is required because the

Trustee's claim for setoff was not brought within the two-year statute of

limitations.  11 U.S.C. § 546(a)(1)(A).  Section 546 states that "[a]n action or

proceeding under section 544, 545, 547, 548, or 553 of this title may not be

commenced after . . . 2 years after the entry of the order for relief."  11 U.S.C.

§ 546(a)(1).  In a voluntary bankruptcy, the order for relief is entered on the date of

the petition, in this case, November 4, 2008.  11 U.S.C. § 301.  Trustee filed his

original Complaint in this adversary action on November 3, 2010—virtually the

last day of the two-year period.  As such, the amendment here, which came much

later, is time barred unless it relates back to the earlier complaint.

Bankruptcy Rule 7015 governs amendment of pleadings in a bankruptcy and

incorporates Fed. R. Civ. P. 15.  Under Rule 15, amendments may be allowed

provided they "relate back" to the original pleading.  Fed. R. Civ. P. 15(c)(1).  In

this situation, "[a]n amendment to a pleading relates back to the date of the original

pleading when: . . . (B) the amendment asserts a claim or defense that arose out of

the conduct, transaction, or occurrence set out—or attempted to be set out—in the

original pleading . . . ."  Fed. R. Civ. P. 15(c)(1)(B).  Provided the amended claim

relates to the same underlying facts—i.e., relates to the same conduct, transaction,

or occurrence—then the amending party may change or add additional legal

theories.  See Lincoln Savs. Bank v. Freese (In re Freese), Bankr. No. 09-02627,

Adv. No. 09-9140, 2010 WL 2978527, at *3 (Bankr. N.D. Iowa July 27, 2010)

("The court's basic inquiry is whether the amended pleading is related to the

general fact situation alleged in the original pleading, so that the defendant had all

the notice that statutes of limitations were intended to provide." (citing Alpern v.

UtiliCorp United, Inc., 84 F.3d 1525, 1543 (8th Cir. 1996); In re Bellanca Aircraft

Corp., 850 F.2d 1275, 1283 (8th Cir. 1988))); see also Saracheck v. Best Value

65

Foods Prods., LLC (In re Agriprocessors, Inc.), Bankr. No. 08-27851, Adv. No.

10-09213, 2012 WL 4919790, at *9–10 (Bankr. N.D. Iowa Oct. 15, 2012)

(discussing relation back of amendments and citing Freese).

The Bank argues Trustee's original Complaint did not indicate that the

particular $1,400,000.00 transfer made from account 367788 was at issue in this

case. As such, the Bank claims the amendment cannot "relate back" and is barred

by the statute of limitations.

Trustee argues its initial Complaint gave the Bank adequate notice that

Trustee intended to pursue improper transactions during the preference period.

Trustee attached to its original Complaint a list of all the banking transactions

occurring during that period—including the $1,400,000 transfer here. Trustee did

not specify a particular transfer in the text of his Complaint but his claims were

instead directed at all transfers during the period. (Compl. to Avoid Preferential

Transfers, ECF Doc. No. 1.) The Complaint alleges that the total amount in which

these transfers were preferential was at least $3,702,445.09. Id. at 2.

The Court concludes that Trustee put the Bank on notice that all transfers

between the Bank and Debtor during the preference period were at issue. Trustee

did attach a list of all transactions and recited the net result or the total amount of

all the transfers during the period. Furthermore, the Complaint states that the Bank

made transfers/deposits and then the Bank "**set-off**" those deposits against the

66

negative balance in the account." Id. (emphasis added).  While Trustee was

originally relying on recovering these payments as preferential transfers under

§ 547(b), it does appear that Trustee was stating they were, or at least could be,

"set-offs."  Trustee is merely adding a theory of recovery under § 553 not as new

set of facts or circumstances.  See In re Freese, 2010 WL 2978527, at *3.  The

Court finds Trustee's § 553 claim is based on the same underlying facts and the

same transactions which were at issue in the initial complaint.  As such, Trustee's

Second Amended Complaint satisfies Rule 15, relates back to the original filing,

and is not time barred.

        The Bank also argues there was no setoff under § 553 because there was no

mutual indebtedness during the "intraday" period when the Bank claims this

transfer occurred.  This argument relies on some of the same legal questions in the

analysis above about when a debt due to overdraft is incurred.  The Court will

assume, without deciding, that whether a debt was incurred which gave rise to the

$1,400,000.00 transfer will fall under the same type of legal analysis on the § 553

claim as that identified above under § 547.  Summary judgment on this point is

thus inappropriate for the same reasons described above on the § 547 issue.

        The Court further notes that Iowa law addresses setoffs by banks and has

held: "Under our law the bank is not entitled to such a setoff prior to insolvency

proceedings involving [the customer]."  C & H Farm Serv. Co. of Iowa v. Farmers

67

Sav. Bank, 449 N.W.2d 866, 876 (Iowa 1989).  In that case the court concluded

that the setoff was done before insolvency proceedings and thus ineffective.  Id.

The Court requests the parties to address the applicability of this case law in this

case—at or before trial.

   **IT IS HEREBY ORDERED** that Luana Savings Bank's Motion for

Summary Judgment as to Trustee's § 547 Preferential Transfer Claim is **DENIED**.

   Dated and Entered:
         April 15, 2013

   _____
   **THAD J. COLLINS, CHIEF JUDGE**
   **UNITED STATES BANKRUPTCY COURT**